## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>**Plaintiff**,<br>vs.<br>**FORREST RINDELS**,<br>**Defendant**. | **No. CR16-2006**<br><br>**REPORT AND RECOMMENDATION** |

On the 21st day of March 2016, this matter came on for hearing on the Motion to Suppress (docket number 24) filed by the Defendant on March 9, 2016. The Government was represented by Assistant United States Attorney Mark A. Tremmel. Defendant Forrest Rindels appeared in court and was represented by his attorney, Adam D. Zenor.

### I. PROCEDURAL HISTORY

On February 3, 2016, Defendant Forrest Rindels was charged by Indictment with receipt of child pornography (Count 1) and three Counts of possession of child pornography (Counts 2-4). Defendant was arraigned on February 10, and the trial was scheduled for April 11. On March 15, 2016, a Superseding Indictment added an additional charge of possession of child pornography (Count 5) and possession of firearms by a drug user (Count 6). Due to the pending motion to suppress, the trial was continued on Defendant's motion and is now scheduled on May 16, 2016.

### II. RELEVANT FACTS

Between October 2014 and January 2015, the Iowa Division of Criminal Investigation ("DCI") conducted an investigation regarding the distribution of child pornography on the internet. It was determined that child pornography had been sent *to* Defendant's residence in Waterloo using peer-to-peer software. On February 4, 2015, law

enforcement obtained a federal search warrant for Defendant's residence, vehicles, and person.

DCI Special Agent Chris Thomas testified that agents went to Defendant's home at about 11:20 a.m. on February 10 to execute the search warrant. Defendant was not home, so Thomas and Special Agent Matt Sauer proceeded to a radio station in Cedar Falls where Defendant was employed. The agents entered the lobby and asked to speak with Forrest Rindels.[1] When Defendant responded to the lobby area, both agents displayed their badges and identified themselves. Thomas asked Defendant if he "would mind speaking to me outside" and Defendant agreed.

After Defendant and the two agents left the building, Agent Thomas asked if Defendant "would mind answering a few questions." He agreed. Thomas asked Defendant if he "would mind speaking to me in my vehicle." Defendant agreed. Thomas testified that he suggested his vehicle because it was a "private place" and "out of the cold."[2] According to Thomas, it is his "general practice" to tell subjects that they are not under arrest and are free to go at any time. Thomas could not recall telling Defendant that he was not under arrest, however, and his report is silent on that fact.

Agent Thomas then asked Defendant if he had the keys to his vehicle. Defendant responded that they were in his "office cubicle." At Thomas' request, Defendant agreed to retrieve the keys. Defendant and the two agents then reentered the building and went to the office cubicle, where Defendant retrieved his keys. At that time, Thomas observed a laptop computer on Defendant's desk and a laptop computer on the floor. Defendant and the two agents then left the building.

---

[1] Both agents were in "plain clothes." Both agents carried a firearm, but Agent Thomas testified that his gun could not be seen under his coat.

[2] During the subsequent interview, Defendant described the weather as "sleeting."

2

After going back outside, Defendant and Agent Thomas went to Thomas' unmarked vehicle, which was located "about two houses away." Thomas testified he did not park directly in front of the radio station because if he was able to speak to Defendant, "I just wanted a private place." The conversation between Defendant and Thomas was recorded.[3] Thomas testified he did not "hide" the fact that the conversation was being recorded, but he did not disclose that fact to Defendant and did not want Defendant to know of the recording.

After getting into the car, Agent Thomas identified himself and told Defendant he was with the Division of Criminal Investigation. Thomas then asked Defendant if he was "cold or hot or anything," and Defendant said he was "fine." In response to questioning by Thomas, Defendant then gave his full name, birth date, and employment. After receiving a phone call and telling the caller he would call back, Thomas then continued with Defendant:

> Forrest, um, while I'll ask you these questions and when I tell you what's goin' on, I want you to feel comfortable, okay. And I want to make you feel as comfortable as possible. So if there's any . . . *you're free to go at any time*. I just . . . I have some water here if you get thirsty.

Transcript of recorded interview (Exhibit 2) at 3:104-4:108 (emphasis added). Defendant responded "I'm fine."

After obtaining information regarding whether Defendant's wife was home or at work, Agent Thomas then advised Defendant that officers had a search warrant for his home, his person, and his vehicles. At Thomas' request, Defendant provided the door code so the agents could enter without doing any damage to the house. Defendant also warned Thomas that he had a dog which potentially could bite.

---

[3] The recording was introduced as Government's Exhibit 1 and a transcript of the recording was introduced as Government's Exhibit 2.

Agent Thomas informed Defendant that he worked with the cyber crime unit, which included investigation into "online internet activities." Defendant was asked whether "in the course of your online activities, have you ever run across any child pornography?" Defendant admitted he had searched for "that kind of thing." When asked whether he was talking about "five-year-olds or like ten-year-olds," Defendant responded "ten and above." Defendant then described the peer-to-peer software which he used, and admitted to searching for "preteen, PTHC."[4] Defendant told Thomas the images could be found on the hard drive of the computer on his desk at work, and could also be found on an external hard drive which he kept at home. Defendant then made additional admissions.

About midway through the 30-minute interview, Agent Thomas got out of the vehicle to speak briefly with Agent Sauer. As he was leaving the vehicle, Thomas told Defendant to "just hang tight." At the conclusion of the interview, Defendant accompanied Thomas and Sauer to Defendant's vehicle. Thomas found a small amount of marijuana, which he told Defendant to "dump out." Defendant was not arrested that day and apparently returned to work. The agents then left.

### III. DISCUSSION

"*Miranda* requires that law enforcement agents provide certain prescribed warnings before conducting an interrogation of a suspect who is in custody." *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007). It is undisputed that Defendant was never given a *Miranda* warning during his interaction with Agents Thomas and Sauer on February 10, 2015. Defendant argues that the failure to give a *Miranda* warning requires suppression of any statements made by Defendant on that date. The Government notes, however, that *Miranda* is only implicated when a suspect is in custody. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'"). Both sides agree that

---

[4] Defendant later explained that PTHC stands for "preteen hardcore."

4

the motion to suppress rises or falls on the sole issue of whether Defendant was in custody at the time of the interrogation.[5]

To determine whether a defendant is in custody for *Miranda* purposes, courts look to "the totality of circumstances confronting the defendant at the time of the interview, and ask[] 'whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest.'" *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) (quoting *United States v. Flores-Sandoval*, 474 F.3d 1142, 1146 (8th Cir. 2007)). The Supreme Court has recognized that the "task of defining 'custody' is a slippery one." *Oregon v. Elstad*, 470 U.S. 298, 309 (1985).

In determining whether a defendant is in custody, the Eighth Circuit Court of Appeals has identified six non-exclusive factors for courts to consider:

> (1) whether the suspect was informed that he was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong arm tactics or strategies were employed; (5) whether the atmosphere was police dominated; or, (6) whether the suspect was placed under arrest at the end of questioning.

*Flores-Sandoval*, 474 F.3d at 1146-47 (citing *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)). In considering these factors, "[t]he first three indicia are mitigating factors, which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." *United States v. Axsom*, 289 F.3d 496, 500-01 (8th Cir. 2002). "The inquiry is an objective one, without consideration of the participants' subjective views." *Huether*, 673 F.3d at 794.

---

[5] Defendant does *not* claim his statement was involuntary.

Here, shortly after Agent Thomas and Defendant entered the car, Thomas told Defendant that "you're free to go at any time." Defendant complains that the advisory was not in a separate declaratory sentence, but instead was sandwiched between Thomas' statements that he wanted Defendant to "feel as comfortable as possible" and a reference to having "water here if you get thirsty." Thomas did not tell Defendant that "answering was voluntary" and could not recall telling Defendant he was not under arrest, although it was Thomas' general practice to do so.

The Eighth Circuit Court of Appeals has observed that "the most obvious and effective means of demonstrating that a suspect has not been taken into custody is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) (quoting *Griffin*, 922 F.2d at 1349). There is no evidence Agent Thomas told Defendant he was not under arrest, or told Defendant he was not required to answer any questions. While Thomas told Defendant he was "free to go at any time," Thomas did not draw particular attention to that option, nor did he ask Defendant whether he understood he was free to terminate the interview. Nonetheless, because Defendant was told he was "free to go at any time," I believe the first *Griffin* factor weighs slightly in favor of finding Defendant was not in custody.

The second factor requires consideration of whether there was any restriction on Defendant's freedom of movement. Here, Defendant agreed to accompany Agent Thomas to his car to answer questions. Thomas did not display a weapon, raise his voice, or use any type of force to coerce Defendant's cooperation. Defendant was not patted down, placed in handcuffs, or even touched by Thomas. Defendant entered the car and sat in the front passenger seat on his own, without Thomas even opening the car door. The car was not locked and there is no evidence Defendant could not have simply stepped out. In fact, after the interview was concluded, Defendant did just that. I have not disregarded the evidence that Defendant was told to "hang tight" when Thomas briefly stepped out of the

vehicle. Thomas was only out of the vehicle for approximately one minute, however, and I do not consider his admonition as a significant restriction on Defendant's freedom of movement. Accordingly, the second *Griffin* factor also weighs in favor of finding Defendant was not in custody. His freedom of movement was certainly not "restricted to the degree associated with formal arrest." *Huether*, 673 F.3d at 794.

Next, the Court must consider whether Defendant "initiated contact or voluntarily acquiesced." Clearly, Defendant did not initiate contact with Agents Thomas and Sauer. Instead, the agents approached Defendant at his place of employment. It can be said, however, that Defendant then "voluntarily acquiesced" to further contact. After the agents introduced themselves in the lobby and asked Defendant to step outside, Defendant could have simply told the agents he did not want to be bothered at work. Instead, he agreed to accompany the agents and, subsequently, to submit to questioning. Accordingly, I believe the third *Griffin* factor does not weigh strongly on either side of the scale.

The fourth *Griffin* factor weighs strongly in favor of a finding Defendant was not in custody. That is, no "strong arm tactics" were employed. The interview was relatively short (less than 30 minutes) and the recording shows that Agent Thomas never raised his voice, threatened Defendant, or used any deceptive stratagems. The questioning was "conversational" throughout.

Defendant argues that the atmosphere surrounding the interview was "police dominated" — the fifth *Griffin* factor. I disagree. Agent Thomas and Defendant were alone in an unmarked vehicle. Agent Sauer was elsewhere (apparently searching Defendant's vehicle or speaking with persons inside the radio station) until Thomas gained Sauer's attention midway through the interview by honking the car horn. After Thomas and Sauer spoke briefly, Sauer again left the area. In *United States v. Axsom*, 289 F.3d 496 (8th Cir. 2002), nine officers entered the defendant's small house to execute a search warrant. Because only two of the officers conducted the interview with defendant, however, the Court concluded that the interrogation was not police dominated. *Id.* at 503.

*See also United States v. Wallace*, 323 F.3d 1109, 1113 (8th Cir. 2003) (questioning by one agent at the defendant's place of employment was not police dominated, despite multiple agents suddenly entering defendant's office earlier and instructing employees to "move away from their desks and move into the main office area."). Here, Thomas and Defendant were alone in Thomas' vehicle. If one officer speaking to a subject in an unmarked car is considered "police dominated," then it is difficult to imagine a circumstance which would *not* be considered police dominated.

The final *Griffin* factor is whether the suspect was placed under arrest at the end of questioning. Defendant was not arrested here, and apparently returned to work. When Agent Thomas asked Defendant toward the end of the interview whether he was "curious at all as to where this is gonna go," Defendant responded "well, probably I'll end up in jail." At that time, Thomas told Defendant that "you're not gonna be arrested right now."

In summary, after considering the totality of circumstances, I find the *Griffin* factors weigh in favor of a finding that Defendant was not in custody while being questioned by Agent Thomas. There was no formal arrest and the restraint on Defendant's freedom of movement was not "of the degree associated with a formal arrest." *Czichray*, 378 F.3d at 826 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). If Defendant was not in custody when interviewed by Agent Thomas, then a *Miranda* warning was not required, and Defendant's motion to suppress should be denied.

## IV. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the Motion to Suppress (docket number 24) filed by the Defendant be **DENIED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need*

*to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on March 21, 2016.*

DATED this 28th day of March, 2016.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA